**In re Robert Lee CRAFT and Judy Kay Craft, Debtor.**

**Robert Lee CRAFT and Judy Kay Craft, Plaintiff,**

**v.**

**Gary RATTI d/b/a Ratti Builders, Defendant.**

**Bankruptcy No. 88–09570.**
**Adv. No. 88–9112.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

June 30, 1989.

Jack A. Weinstein, Saginaw, Mich., for plaintiff.

Douglas W. Taylor, Saginaw, Mich., for defendant.

## MEMORANDUM OPINION ON PLAINTIFFS' COMPLAINT TO DETERMINE INVALIDITY OF DEFENDANT'S LIEN

ARTHUR J. SPECTOR, Bankruptcy Judge.

Robert Lee and Judy Kay Craft ("the debtors" or "the plaintiffs") filed their voluntary petition for relief under Chapter 13 of the Bankruptcy Code on July 29, 1988. At the time they filed, their home was in jeopardy of foreclosure of a construction

lien asserted by Gary Ratti d/b/a Ratti Builders ("the defendant"). Mr. Ratti objected to the confirmation of the debtors' Chapter 13 plan on the ground that it failed to provide for the payment in full of his secured claim (11 U.S.C. § 1325(a)(5)) and for the reason that the plaintiffs filed the plan in bad faith (11 U.S.C. § 1325(a)(3)). The debtors claimed that Mr. Ratti had no secured claim because he had allegedly failed to perfect his construction lien. The debtors filed this adversary proceeding to determine the invalidity of the Ratti lien and to set it aside. The plaintiffs also argued that the rate of interest contained in the contract was usurious, and therefore, that they are entitled to deduct their own attorney's fees from the lien amount. As to the major issue, the validity of the lien, the question is: Did Mr. Ratti perfect his construction lien for purposes of the Construction Lien Act, as amended, Mich. Comp.Laws § 570.1101 *et seq.;* Mich.Stat. Ann. § 26.316(101), *et seq.*?[1] The following constitute my findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, incorporating F.R.Civ.P. 52.

The adversary proceeding is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(K).

On May 11, 1987, Mrs. Craft signed a contract with the defendant for a major remodeling of the plaintiffs' home at 7949 Ditch Road, Chesaning, Michigan. The defendant started work that very day. No money was paid at the beginning of the job as the plaintiffs had represented to Mr. Ratti before the defendant began work that they had applied for a mortgage loan and that the financing was forthcoming. The defendant relied on this representation and began the work. By May 27, the defendant had a large part of the job done and learned that no loan had yet been obtained. He became justifiably insecure as to payment, and so drafted an addendum to the contract which the defendant and both plaintiffs signed on May 28, 1987. The addendum (Exhibit A) provided a contract price of $24,530 and that the entire amount would be due "within twenty (20)

days of bank appraisel (sic)". On that day the bulk of the work was completed. However, the defendant's contention is that two of his subcontractors had not yet finished their tasks and that he personally had to return to complete one small item during the months which followed. The plaintiffs dispute each of these contentions.

Jack Armstrong, the plumber retained by the defendant for the Craft job, testified that he returned to the home on July 24 to hook up an icemaker kit and to work in the sump room at the defendant's direction. He claimed the house was unlocked when he got there. He did that work and never returned. While there, however, he noticed that some work still needed to be done to the basement and to the exterior of the home.

Mrs. Craft rebutted this testimony. She said that she was not working in July, 1987 and so, if anyone would have given Mr. Armstrong entrance to her home, it would have been she, yet she had never laid eyes on him before. Furthermore, it was not her habit to leave the house with the doors unlocked. She also intimated that Mr. Armstrong may have been confused with a visit made by a man earlier identified as Mr. Armstrong's elderly father to the Craft home in response to Mrs. Craft's call to fix a leaky refrigerator. She admitted, however, that she had never paid for this plumbing service and so the possibility exists that the work had been billed to Mr. Ratti as part of the contract. On her cross-examination, she stated that indeed she might have been back at work on July 24 when Mr. Armstrong said he was at the home, and that she did leave the doors unlocked while workmen were at the house in May.

Ray Cornford, the electrician retained by the defendant for the Craft job, testified that he came to the home on July 1 to install fixtures, receptacles and covers. The work took most of that day. His testimony was corroborated by Exhibit C, which is his (R.C. Electric's) July 1 invoice for $1,070 addressed to the defendant for the electrical work he did at the Craft

---

1. Hereafter, reference will be only to the section number of the Construction Lien Act.

home; he testified that he prepared and dated the bill the same day he finished the work—July 1.

Mrs. Craft testified that she had called him to come to the home to correct some electrical problems, that she paid for the services by her own check on June 25, the day the work was done, and that no other work was done by Mr. Cornford after that date. Indeed Exhibit # 9, a billing statement for $40 for a "service call" from R.C. Electric addressed to the plaintiffs (and not to the defendant) and dated June 25, 1987, corroborates her statement. However, on cross-examination she admitted that neither she nor her husband kept a record of the dates that work was done on the home, that she left financial matters generally, and this remodeling project specifically, to her husband, who was working full time during the relevant period, and that she did not remember what she was doing on July 1 when Mr. Cornford stated he came to the home.

Kevin Kenne, who was formerly employed by the defendant, testified that he and the defendant returned to the Craft home in mid-August to caulk the windows and to finish some outside trim work. The whole job took not more than an hour. The defendant testified that the caulk and trim were actually done on September 24th.

On the other hand, Mrs. Craft testified that except for the plumber who returned to hook up the refrigerator, no work was ever done on this remodeling contract after May 28, 1987. Mr. Craft confirmed that as of May 28, no further work appeared necessary. He also said that although the defendant came by at various times throughout the summer to discuss payment, he never said he was planning to return to finish any work. Finally, the plaintiffs' friend, Paul Lerash, testified that he visited the home on June 20, 1987. He said he could tell that the house had been remodeled but that he could not see that anything had been left undone.

The defendant testified that he visited the plaintiffs' home on various occasions to try to collect the balance owed him or at least to learn of the plaintiffs' progress in obtaining a loan. On August 11, 1987, Douglas W. Taylor, the defendant's attorney, sent the plaintiffs a letter (Exhibit 7) requesting them to execute a note and mortgage to the defendant. The plaintiffs did not comply with this request. In September, when it seemed to him that the plaintiffs were now avoiding him, the defendant decided to place a construction lien on the home. At roughly the same time, the defendant learned that the plaintiffs had finally obtained bank financing, yet they tendered to him only $4,000 of the $24,530 balance due him.

With respect to the question of financing, Mrs. Craft testified that in May, they had told Mr. Ratti that they were applying for financing in order to pay for the remodeling job, but that they had been unexpectedly turned down. They tried all summer to obtain the money from other institutions and finally got approval from NBD Mortgage Company. However, Mr. Craft felt it was necessary to purposely omit certain information from the loan application in order to deceive the bank into granting them the loan. Specifically, they did not disclose that they owed Mr. Ratti over $24,000 or that they owed a carpet supplier $2,000 and Mrs. Craft's mother another $2,000. They also lied to the bank by representing that no improvements had been made to their home within the past 120 days. In fact, she submitted an affidavit to the bank falsely attesting that as of September 18, 1987 "no improvements or alterations had been made to [their] property within the last 4 months and that there were no claims of laborers or material(men) that remained unpaid." Furthermore, she admitted that they had borrowed the $2,000 from her mother in order to falsely show NBD that they had $2,000 of their own money to pay for closing costs.

When the proceeds of the loan were finally paid out by the bank, all the plaintiffs received was $8,000, she said. The bank, she claimed, disbursed $13,000 to pay off the outstanding debt on their 1985 Blazer pick-up truck and $10,000 to various charge card issuers. This, she said, without corroborating testimony from a bank employ-

ee or documentary evidence, was required by the bank. The remaining $8,000 which the plaintiffs received, they disbursed as follows: $4,000 to the defendant; $2,000 to an unsecured creditor, their carpet supplier; and $2,000 to Mrs. Craft's mother.

On September 28, 1987, the defendant recorded with the Saginaw County Register of Deeds a construction lien on the Craft home. He subsequently brought suit to foreclose on the lien which action was automatically stayed when the debtors filed their petition for relief. These dates are important because the plaintiffs' strongest attack on the validity of the defendant's lien is that the lien was recorded more than 90 days after the last work was performed. Act § 111(1).[2] As the lien was recorded on September 28, 1987, if no work was performed after June 29, 1987, the lien is invalid. This issue, therefore, boils down strictly to a credibility contest. For the plaintiffs to prevail, I would have to disbelieve Mr. Armstrong, Mr. Cornford, Mr. Kenne and the defendant, and believe Mr. and Mrs. Craft.

I find that Mr. Armstrong did not finish his plumbing subcontract on July 24, 1987, as he testified. His typewritten bill to the defendant (Exhibit D) was dated May 28, 1987. It shows in handwriting obviously added subsequently that Mr. Armstrong received a partial payment from the defendant on June 20th. Mr. Armstrong brought no records to corroborate the July 24th date. I believe Mr. Armstrong could very well have been mistaken as to the date. The defendant has the burden of proving the relevant dates to establish his lien. On this point, he has failed to carry that burden.

The issue of the dates of the other alleged work is a different story. I cannot believe Mrs. Craft. She admitted on cross-examination that there is no way to tell when she is lying, something she admitted to having done on numerous occasions with reference to this case. For instance, at the beginning of the cross-examination, she denied having deceived NBD. Only after her deposition transcript was read to her did she own up to having previously testified to the deception. She admitted paying a preference to her mother, yet her Chapter 13 Statement makes no reference to that payment. Finally, her uncorroborated version of what transpired at the NBD loan closing was simply not credible. She claimed that the bank refused to disburse the entire loan proceeds to the plaintiffs, but decided itself which of their various creditors to pay and which not to. For example, she said that NBD chose to disburse $13,000 to the bank (not NBD) which held the security interest on the plaintiffs' 1985 Blazer, yet NBD did not take a security interest in it for itself. Why would it do that? It also allegedly chose to pay off some credit card debts, but not others, even though none were secured or were owed to subsidiaries of NBD. Why would it do that? I find that, with reference to this case, Mrs. Craft is not a person to be believed and so, on a close question of fact, as we have in this case, I believe the contradicting testimony of any otherwise credible witness.

Mr. Cornford was such a witness. He testified that he performed electrical work as part of his subcontract with the defendant on the Craft home on July 1. His testimony was corroborated by an invoice of the same date. I believe him.[3]

2. This section states:
(1) Notwithstanding section 109 the right of a contractor, subcontractor, laborer, or supplier to a construction lien created by this act shall cease to exist unless, within 90 days after the lien claimant's last furnishing of labor or material for the improvement, pursuant to the lien claimant's contract, a claim of lien is recorded in the office of the register of deeds for each county where the real property to which the improvement was made is located. A claim of lien shall be valid only as to the real property described in the claim of lien and located within the county where the claim of lien has been recorded.

3. Because I also find that Mr. Ratti personally performed work after June 29, I need not dwell on the plaintiffs' erroneous assertion that the fact that Messrs. Cornford and Armstrong were independent contractors, and not employees of the defendant, somehow disqualifies their work as work within 90 days of the date the lien is recorded.

■ I also believe Mr. Ratti and Mr. Kenne that some work—the caulking and trim—was performed no earlier than mid-August. The defendant said he did not finish the outside work because he did not have the caulk to do it in May and did not wish to make a special trip back to the plaintiffs' home to finish it until he had another job in the area, which was not until September. That he decided to finish this work at all after a four month run-around for his money is strange. Mr. Ratti did not look like a saint. I assume, therefore, that if he actually did the work in September as he said, he might have left it undone merely as a safety valve, to allow him to finish the job within the 90-day lien period in case he found that the plaintiffs were merely stringing him along about a loan to pay him. If that is why he did it, he needed to. Trivial items may be considered as work pursuant to the contract to keep lien rights alive, even under the previous statutes, which were sometimes contrued strictly. *See e.g. Blackwell v. Bornstein*, 100 Mich. App. 550, 299 N.W.2d 397 (1980); *Bolhuis Lumber & Mfr. Co. v. Van Tubergen*, 250 Mich. 686, 230 N.W. 910 (1930); *Vanderhorst v. Kalamazoo Apts. Corp.*, 239 Mich. 593, 215 N.W. 57 (1927); *but cf. Superior Steel Systems, Inc. v. Nature's Nuggets, Inc.*, 174 Mich.App. 368, 435 N.W.2d 492 (1989) (recovering machinery after leaving it at jobsite for months is not qualifying work). Since the last work under the defendant's contract was performed after June 29, 1987, the lien was timely recorded.

■ The plaintiffs also claimed that the lien was invalid by reason of a variety of technical defects. Specifically, they alleged that: (a) the defendant failed to list the number and the type of the license he held; (b) the sworn statement is incorrect in that it failed to list two suppliers; and (c) the statement of lien is incorrect in that it states the wrong date the work began. The plaintiffs argued that the Construction Lien Act, as an act in derogation of the common law, should be strictly construed, relying on *J & I Service Station, Inc. v. Wash Wagon of Michigan, Inc.*, 120 Mich. App. 533, 327 N.W.2d 518 (1982). However, the law is directly to the contrary. Section 302(1) of the Act explicitly states:

This act is declared to be a remedial statute, and shall be liberally construed to secure the beneficial results, intents, and purposes of this act. Substantial compliance with the provisions of this act shall be sufficient for the validity of the construction liens provided for in this act, and to give jurisdiction to the court to enforce them.

"[T]he language of § 302(1) is clear and unambiguous. The statute explicitly indicates that the statute is remedial in nature and shall be liberally construed." *Norcross Company v. Turner–Fisher Associates*, 165 Mich.App. 170, 178, 418 N.W.2d 418 (1987). Therefore, the question is: Did the defendant substantially comply with the provisions of the Construction Lien Act?

■ Section 114 of the Act provides:

A contractor shall not have a right to a construction lien upon the interest of any owner or lessee in a residential structure unless the contractor has provided an improvement to the residential structure pursuant to a written contract between the owner or lessee and the contractor and any amendments or additions to the contract also shall be in writing. The contract required by this section shall contain a statement in type no smaller than that of the body of the contract, setting forth all of the following:

(a) that a residential builder or a residential maintenance and alteration contractor is required to be licensed....

(b) if the contractor is required to be licensed to provide the contracted improvement, that the contractor is so licensed.

(c) if a license is required, the contractor's license number.

Clearly, the written contract and the written addendum to it (Exhibits 2 and 3 respectively) lack any statement that the defendant had to be licensed to do the job and any reference to the type of license possessed by the defendant or the number of such license. In fact, the documents do not refer to the word license at all. Obviously,

the defendant has not complied with this section of the Act. However, the defendant is a licensed contractor and no one disputes that fact. Does the defendant's failure to provide this license information on the otherwise complete written contract preclude him from obtaining a lien for the work? Has he substantially complied with the requirement despite the omission?

Although the plain language of this section brooks no compromise—it clearly says that a contractor may not obtain a lien unless the written contract provides for the license information—that statute must be read in light of the other very clear statute, § 302(1), which says that substantial compliance is sufficient. It seems that the legislature's purpose in requiring that a contractor identify the type and number of his license is to ensure to the homeowner that the contractor is indeed licensed, and that if there is a complaint about the workmanship or other conduct of the contractor, the task of reporting the complaint to the Department of Licensing and Regulation is made simpler. Since the defendant has, and at all relevant times had, the appropriate license, and since the plaintiffs acknowledged that they have no complaints about the defendant's work or practices, to hold that because of this technical omission the defendant should be precluded from recovery would unduly exalt form over substance and give, in a case such as this, an owner protection in excess of what that owner needs or what is just. Such a ruling would fly in the face of the liberal construction rule required by the Act. Accordingly, the defendant's failure to include the license information on the contract, although an error which ought not be repeated, does not preclude him from obtaining a valid lien on the premises in this case.

■ Section 110 of the Act requires a contractor to provide the owner with a sworn statement whenever he requests payment from the owner. "The sworn statement shall list each subcontractor and supplier with whom the person issuing the sworn statement has contracted, relative to the improvement to the real property...." Act § 110(4). The defendant testified that

he obtained supplies for the Craft job from A.T. Frank & Co., but that he forgot to list that supplier on the sworn statement (Exhibit 5) which he delivered to the plaintiffs. He also acknowledged that he failed to list Saginaw Kitchens as a supplier because he thought that Wickes Lumber (which was listed) had supplied the kitchen materials. The sworn statement disclosed that the total cost of the materials purchased by the defendant for the Craft job was $19,350 and that none of that amount remained unpaid. The amounts omitted from the sworn statement totaled only $3,988. *Cf. Vorrath v. Garrelts*, 35 Mich.App. 463, 192 N.W.2d 547 (1971). No allegation was made that that amount was unpaid when the defendant provided the sworn statement. *See Halpin v. Garman*, 192 Mich. 71, 158 N.W. 29 (1916). Under these facts, the defendant substantially performed the requirement of providing a sworn statement.

Even if the defendant had not paid these omitted suppliers, the plaintiffs would be unaffected since these suppliers would likely have had no lien rights against them. For a supplier to be able to lien a job, it must first file a notice of furnishing pursuant to § 109(1) of the Act. The plaintiffs presented no proofs to show that these suppliers ever served them with a notice of furnishing. It thus appears that there was no risk of the plaintiffs ever having to double pay for this job.

■ Furthermore, even had the defendant failed entirely to provide a sworn statement, he would not lose his right to lien the job. A contractor may provide a sworn statement even after the statement of lien is recorded; he is merely precluded from filing a complaint to foreclose the lien until the sworn statement is provided. Act § 117(7). In light of these factors, no equitable purpose is served by dwelling on the technical omission.

■ Finally, the plaintiffs assert that the defendant's failure to state the proper date of commencement of the work invalidates his claim of lien. The claim of lien (Exhibit # 4) states that the work on this job began on May 28, 1987. The proofs establish that

the work was commenced on May 11, 1987. The plaintiffs are therefore correct in asserting that the claim of lien states the incorrect date of commencement. What of it? What relevance does the date of commencement have under these circumstances?

The date of commencement has relevance for subcontractors and suppliers who do not have direct contact with the owner. It ties in with their requirement to serve the owner with a notice of furnishing pursuant to § 109, which is similar in purpose to the old Mechanics Lien Act's requirement of a "notice of intent" to lien. This section provides that a subcontractor or supplier shall provide a notice of furnishing to the owner and to the general contractor within 20 days after furnishing the first labor or materials.[4] When such a subcontractor or supplier claims a lien, the owner can easily check the date the claimant asserted his work began or materials were first provided against the notice of furnishing served earlier. This expedited discovery is obviously of help since if the notice of furnishing was not timely served, the owner might have a valid defense.

Courts interpreting the previous statute held that a contractor who dealt directly with the owner need not comply with the statutory requirement of furnishing a notice of intent, as obviously the owner knew with whom he had contracted. *See Wallich Lumber Co. v. Golds*, 375 Mich. 323, 134 N.W.2d 722 (1965); *Childers Mfg. Co. v. Altman*, 100 Mich.App. 289, 298 N.W.2d 725 (1980); *P.H.I. Const. Co. v. Riverview Commons Assoc.*, 80 Mich.App. 518, 264 N.W.2d 50 (1978). Under the Construction Lien Act, a judicial exception is unnecessary because the statute is written in such a way as to exclude contractors from the requirement. Since a contractor is not required to provide a notice of furnishing, there is no relevance to the statutory form claim of lien provision for stating the date

of commencement of the work when it is a contractor who is seeking the lien.

Under a predecessor statute, too, the rule was that an erroneous statement in the claim of lien as to the date of commencement will not bar attachment or enforcement of the lien. *Union Trust Co. v. Casserly*, 127 Mich. 183, 86 N.W. 545 (1901). That case succinctly stated facts and concerns very similar to those here. The court said:

> On the merits of the case numerous objections are urged,—so many, in fact, as to suggest the thought that a complainant must travel a rough way before he reaches the goal in these cases if the defendant urges all plausible defenses against his claim. Yet the facts of the case are not complicated. There is no doubt that the materials furnished by the complainant went into defendant's house; that they were substantially of the value found by the circuit judge; that they have not been paid for; [and] that a claim of lien was filed within the statutory time....

127 Mich. at 184–185, 86 N.W. 545.

Even in a case which held that the prior Mechanics Lien Act should be strictly construed to the point where the lien attaches, the court stated:

> [S]trict compliance with the notice provision does not equate with allowing owners to purposely transform a statutory requirement intended to protect them from unanticipated lien claims into a tool to prevent honest lien claimants from asserting their own statutory rights. We do not feel the law should be interpreted to permit such practice.

*William Moors, Inc. v. Pine Lake Shopping Center, Inc. # 1*, 74 Mich.App. 12, 15, 253 N.W.2d 658 (1977). The lien is valid.

■ The plaintiffs state that 2% per month interest is a usurious rate. Mich. Comp.Laws § 438.31; Mich.Stat.Ann. § 19.15(1) (7% is the legal maximum but for numerous exceptions).[5] The question, how-

---

4. A laborer is also required to serve a notice of furnishing to preserve his lien rights but has a different deadline.

5. Mich.Comp.Laws § 438.31 states:

Sec. 1. The interest of money shall be at the rate of $5.00 upon $100.00 for a year, and at the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties to

ever, is whether the plaintiffs' agreement contained in the written contract (Exhibit #3) to pay "[a] 2% per month service charge ... on unpaid balance" is interest. This issue is controlled by the recent case of *Corrigan v. Insilco Corp.*, 176 Mich. App. 262, 439 N.W.2d 350 (1989); *also see Attorney General v. Contract Purchase Corp.*, 327 Mich. 636, 643, 42 N.W.2d 768 (1950); *Hartwick Lumber Co. v. Perlman*, 245 Mich. 3, 222 N.W. 147 (1928). As the *Corrigan* court pointed out, section (1) of the usury statute provides that the "seven percent rule does not apply 'to any time price differential which may be charged upon sales of goods or services on credit.'" *Id.* 176 Mich.App. at 266, 439 N.W.2d 350. In *Corrigan*, as in this case, the contract was, in essence, one for home construction; in *Corrigan*, only the sale of goods was involved; here, it is goods and services.

The *Corrigan* court also looked to two other statutes which regulate interest rates in the construction financing field. The court determined that the Retail Installment Sales Act, [RISA], Mich.Comp.Laws § 445.851 *et seq.*; Mich.Stat.Ann. § 19.416(101) *et seq.* applied to the transaction in question. That transaction dealt with the purchase of goods from Insilco Corporation for the construction of the plaintiff's *new* home. That type of transaction fell within the net of RISA. RISA provides a maximum of 10% interest on the financing of such transactions. Because the contract in question provided for only a 9½ interest rate, it was ruled valid.

▬ The court also considered but disregarded the Home Improvement Finance Act, Mich.Comp.Laws § 445.1101 *et seq.*; Mich.Stat.Ann. § 19.417(101) *et seq.* be-

cause that transaction did not deal with an improvement of an existing home, but the construction of a new home. Here we have the opposite, as the plaintiffs contracted for the remodeling of their already existing home. The 10% ceiling fixed by RISA, therefore, is inapplicable. The Home Improvement Finance Act, however, is also inapplicable because it applies only to home improvement installment contracts. Such a contract is defined as "an agreement covering a home improvement installment sale, whether contained in 1 or more documents, together with any accompanying promissory note or other evidence of indebtedness, pursuant to which the buyer promises to pay *in installments* all or any part of the time sale price or prices of goods and services, or services." Mich.Comp.Laws § 445.1102(*l*). (Emphasis added). The contract at issue here does not call for installment payments. It merely provides that if the plaintiffs do not timely pay, they will be burdened with a "service charge". From the contract, it appears that the parties negotiated for an immediate payment in full as soon as the contingency contained therein—the passage of 20 days after bank appraisal—was satisfied. In fact, the contract explicitly says, "Total amount due" upon that occurrence. No installments were contemplated. A time price differential in case of late payment was.

The word "installment" is defined as follows: "Partial payment of a debt or collection of a receivable. Different portions of the same debt payable at different successive periods as agreed. Partial payments on account of a debt." *Black's Law Dictionary* (5th ed.). Similarly, "installment

stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum. This act shall not apply to the rate of interest on any note, bond or other evidence of indebtedness issued by any corporation, association or person, the issue and rate of interest of which have been expressly authorized by the public service commission or the securities bureau of the department of commerce, or is regulated by any other law of this state, or of the United States, nor shall it apply to any time price differential which may be charged upon sales of goods or services on credit. This act shall not be construed to repeal sec-

tion 78 of Act No. 327 of the Public Acts of 1931, as amended, being section 450.78 of the Compiled Laws of 1948. This act shall not render unlawful, the purchase of any note, bond or other evidence of indebtedness theretofore issued by any borrower not then domiciled in this state, which bear any rate of interest which is lawful under the law of the domicile of the borrower at the date of issue thereof, and in such case any such rate of interest may be charged and received by any person, firm, corporation or association in this state.

credit" is defined as a "commercial arrangement in which buyer undertakes to pay *in more than one payment* and seller agrees to sell on such basis and in which a finance charge may be exacted." (Emphasis added). *Id. Also see Campbell v. American Alkili Co.*, 125 F. 207, 209 (CCA 3rd 1903); *Kenney v. Los Feliz Inv. Co.*, 121 Cal.App. 378, 9 P.2d 225, 228 (1932) ("installment" is a partial payment on account of a debt due "and agreed to be paid at a different time from that fixed for the payment of the other part"); *White v. White*, 167 Ind.App. 459, 338 N.E.2d 749, 754 (1976); *J.H. Moon & Sons v. Hood*, 244 Miss. 564, 144 So.2d 782, 784 (1962) ("installment" means a portion of debt or sum of money which is divided into portions that are made payable at different times); *Turk v. French*, 202 Okl. 60, 210 P.2d 154, 156 (1949) (an installment is a different portion of the same debt payable at different successive periods as agreed). Therefore, although the Home Improvement Finance Act has its own ceiling for interest rates which is below the 2% per month contained in the parties' agreement, that Act, too, does not apply.

The upshot of this is that no specific statute limits the rate of the time price differential agreed to by the parties in this case. Since the 2% per month is less than the criminal usury rate of 25% per annum, Mich.Comp.Laws § 438.41, it is valid, legal and enforceable. For this reason, the plaintiffs request that "interest" be disallowed and that their own attorney's fees be charged back against the defendant pursuant to the penalty provisions of the usury statute (Mich.Comp.Laws § 438.32) must be denied.

For all of the reasons stated, a judgment of no cause of action will enter and the secured claim of the defendant in the bankruptcy case in chief will be allowed.